WATSON et al. v. HUNTINGTON et al.

(Circuit Court of Appeals, Second Circuit.   April 7, 1914.)

No. 171.

1. EQUITY (§ 148*)—PLEADING—MULTIFARIOUSNESS.
   A bill by stockholders of a corporation to recover damages from the defendant on the ground of his fraudulent acts as an officer of the corporation by which, as alleged, certain of the complainants were induced to purchase their stock, and others, who had previously purchased, were otherwise injured, is bad for multifariousness; the right to relief of the two groups being based on a different state of facts.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 341–367;  Dec. Dig. § 148.*]

2. EQUITY (§ 46*)—JURISDICTION—ADEQUATE REMEDY AT LAW.
   A stockholder cannot maintain a suit in equity to recover the amount he paid for his stock on the ground that he was induced to purchase the same by the fraud of defendant in making false representations in respect to the condition and business of the corporation;  his remedy at law being full and complete.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 151, 152, 157, 159–163;  Dec. Dig. § 46.*]

3. EQUITY (§ 51*)—JURISDICTION—MULTIPLICITY OF SUITS.
   A mere community of interest between plaintiffs in matters of law and fact does not make it admissible for all such plaintiffs, each of whom has a separate cause of action at law against the defendant for a tort, to join in a suit in equity in order to avoid a multiplicity of actions, especially where the defendant makes no objection to such possible separate actions.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 167–171; Dec. Dig. § 51.*]

4. EQUITY (§ 383*)—FEDERAL COURTS—CHANGE OF FORM OF ACTION.
   Where a bill in equity, filed in a federal court by numerous complainants, states a separate cause of action at law in favor of each complainant against the defendant, but no ground of jurisdiction in equity, the suit should not be dismissed, but each complainant should be permitted to file a separate complaint.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. § 787; Dec. Dig. § 383.*]

   Rogers, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Wentworth Watson and others against Henry E. Huntington and others.   Decree dismissing the bill, and complainants appeal.   Reversed.

Plaintiffs, 38 in number, sued to have certain votes, cast by defendant Huntington under a voting trust agreement, canceled so far as plaintiffs are concerned, and to have a conversion of the holdings of stock in the National Steel & Wire Company into the securities of the National Consolidated Wire & Cable Company set aside, so that plaintiffs, respectively, may be restored to their rights as owners of stock in the National Steel & Wire Company for the purposes of this suit, and that defendant Huntington may be decreed to account and pay over to plaintiffs, respectively, the entire amounts which they invested in their respective holdings of stock in the National Steel & Wire Company, and for other equitable relief.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following facts are alleged in the bill:

Plaintiffs own shares in the National Steel & Wire Company, and all except one own securities of the National Consolidated Wire & Cable Company. Some bought prior to 1904; others in 1904, 1905, and 1906. The National Steel & Wire Company, called the holding corporation, was organized about February 4, 1902; its only source of income being from the operations of certain subsidiary companies. A balance sheet of the books of the holding company for the period from July 1, 1903, to March 31, 1904, showed a surplus in favor of the company, whereas in truth this apparent surplus was fictitious and the liabilities were in fact largely in excess of the assets of the corporation, as the directors knew. Details of the bill show suppression of the fact of hypothecations, pledges, and of certain guaranties of obligations which were outstanding and unpaid, losses in business, and insolvency in April, 1904. Notwithstanding this condition of insolvency, on or before April 1, 1904, and from and after January 13, 1903, the directors had caused dividends to be paid on the preferred stock of the holding corporation. About April, 1904, Huntington and Webster entered into a plan and agreement to promote the sale of stock of the holding corporation in order to carry on the business and to provide funds to pay themselves an agreed price for their interest in a subsidiary corporation, the Safety Insulated Wire & Cable Company. The scheme was that balance sheets and reports should be issued showing that the holding corporation was the absolute owner of the shares of stock of the subsidiary companies and that dividends should be continued, notwithstanding the condition of insolvency. In aid of the plan, about May 17, 1904, Huntington was appointed by the directors of the holding company a managing director, and on May 19, 1904, a voting trust to continue for three years from September 1, 1904, was authorized by the board of directors of the holding company. The trustees under this voting trust were defendants Huntington, Mills, and Monroe. Under the voting trust the trustees agreed to inform the stockholders of the condition of the corporation, of its business and its progress. Plaintiffs, relying upon the representations contained in the voting trust agreement and upon the well-known financial reputation and business experience of the trustees, surrendered their respective certificates of stock and all their rights represented by the stock, including the right to vote for three years from September 1, 1904.

But the defendant Huntington failed to inform the stockholders of the true condition of affairs and as managing director participated in the declaration of dividends, although the corporation was insolvent, and thereby falsely represented that the corporation was not insolvent, and took part generally in the doings under the plan agreed upon with Webster.

The voting trust is charged to have been contrived by Huntington and Webster to aid them in preventing the plaintiffs, stockholders in the holding corporation, from learning the true condition of their company and to enable Huntington, as a voting trustee, to approve on behalf of his and Webster's doings by voting stock in favor of resolutions validating what had been done. Huntington and Webster dominated and controlled the board of directors of the holding company and subsequent to April 30, 1904, controlled a large majority of the stock of the Safety Insulated Wire & Cable Company, a subsidiary company, for which they paid $15 a share but which they sold to the holding company at $70 a share, and in that way Huntington and Webster claimed to be creditors of the holding company in a large sum, so that the holding company became indebted to Huntington and Webster in large sums, as evidenced by notes of the holding company secretly secured by stock of the subsidiary company as collateral, in violation of the charter and by-laws of the holding company

Thereafter, in execution of the scheme charged, Huntington and others, constituting the executive committee of the holding company, issued false reports for distribution in promoting stock sales, and in 1904, 1905, and 1906 fraudulently represented to plaintiffs that the corporation was earning dividends and was a great success, and did other things which induced some of the plaintiffs to make further investments and to turn over their rights under the voting trust agreement heretofore referred to.

Plaintiffs say that Huntington and Webster, knowing that the holding company could not continue to carry on its business, about February, 1906, organized the National Consolidated Wire & Cable Company for the purpose, among others, of taking over the securities of the holding company and issuing its own securities in exchange therefor. This new corporation was organized with dummy officers and directors and has transacted no business except on January 15, 1906, when the dummy board authorized an issue of $8,000,000 of bonds secured by preferred stock of the holding company. Huntington and Webster, keeping up the purpose of having plaintiffs remain ignorant of the real facts, issued reports of the holding company and of the National Consolidated Wire & Cable Company for the year ending June 30, 1906, fraudulently representing that the business of the holding company was more than satisfactory and that it owned certain subsidiary campanies. Thereafter receivers were appointed for certain of the subsidiary companies and for the holding corporation. Plaintiffs say that they were deluded by the course of misrepresentation and deceit on the part of Huntington down to the time when receivers were appointed.

The bill was dismissed for lack of equity and because of multifariousness. Plaintiffs appeal.

Isaac W. Dyer, of Portland, Me., Bristol & White, of New Haven, Conn., Frederick H. Siggin, and Carl W. Smith, for appellants.

Leventritt, Cook & Nathan, of New York City (Walter C. Noyes and Alfred A. Cook, both of New York City, of counsel), for appellee Huntington.

Before COXE, ROGERS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). At the outset it is to be noted that one of the plaintiffs, Herbert Francis Smith, alleges that he bought shares in the National Steel & Wire Company in 1905, and that he is "still" the owner of the same number of shares that he bought in the holding corporation. It is true that in a subsequent paragraph of the complaint there is an allegation that "all" of the plaintiffs were induced to surrender their certificates of stock and right of voting the same in the holding company to the voting trustees and to convert their holdings into the securities of the National Consolidated Wire & Cable Company. Nevertheless, under the special averment as to Smith, he should be judged as a stockholder in the original holding company and not asking to be restored to the position of stockholder in the holding corporation.

[1] The suit is not brought by plaintiffs in behalf of themselves and all other stockholders in the holding company who may desire to become parties plaintiff thereto; nor are plaintiffs suing in behalf of the corporation, which is not even a party to the bill. The real object of the suit is to recover the amounts which plaintiffs respectively invested in their respective holdings in the holding company, and in order to get their money they ask the court to remove such impediments as plaintiffs think will be necessary to have removed before they can recover.

The conspiracy charged was a continuing one initiated by arrangement with agents in England whereby stock sales were to be promoted in order to raise money to carry on the business of the holding company and to provide money for paying the defendant Huntington and one Webster an agreed price for their interest in a certain one of the

subsidiary corporations, and continued always with the purpose of stock selling even until the plaintiffs had converted their stock into securities of the National Consolidated Wire & Cable Company. Reduced to a few words, this was the scheme charged: The conspirators persuaded certain of the plaintiffs as investors to come into the holding company, and when they had been drawn in they deceived them, as well as others who had already bought stock, as to the affairs of their corporation and misled them to such an extent as to induce them to surrender the control of their stock to the conspirators who, by the exercise of such control, carried on the scheme and were enabled to manipulate the concerns of the holding corporation and further deceive plaintiffs to their damage, even in some instances inducing them to invest more money, so that finally they were left with stock in a corporation much impoverished by wrongs of the conspirators.

Now from such a position plaintiffs wish to be relieved by some decree which will compel defendant Huntington to pay back to them the amounts paid by them respectively for their stock. They want to get out whole. It appearing, however, that some of the plaintiffs bought their stock prior to the 1st of April, 1904, which was before the origin of the conspiracy charged, clearly such persons, in the first instance at least, were not drawn in by the acts of any combination as charged. As to them the conspirators' wrongs consisted in having persuaded them to enter into the voting trust and thereafter in having deceived them concerning corporate affairs and in having acted as charged under the voting trust. Such persons could not herein recover the amounts paid for their stock upon the ground of false representations made before they bought shares. The relief they ask is plainly based upon a different state of facts from that relied on by those who came in because of fraudulent representations. May the two groups nevertheless unite in one bill claiming relief in equity because all went into the voting trust agreement and were victimized by the acts done by defendant Huntington, and this irrespective of the time when they obtained their shares? In other words, may the bill be sustained in equity as stating grounds for a return of the money paid? We think not, and for these reasons:

[2] The object of the complaint being a recovery of damages specifically named to be the respective sums put in by plaintiffs respectively, an accounting is wholly unnecessary. Nor is it at all necessary that the votes of the trustees under the voting trust should be set aside, or that any conversion of the stock of the holding company be canceled, for if defendant Huntington was guilty of the frauds charged by plaintiffs in fraudulently misrepresenting things after plaintiffs became stockholders, and they relied upon the false representations, each of the plaintiffs can recover damages upon the ground of fraud and his remedy at law is full and adequate. U. S. v. Bitter Root Development Co., 200 U. S. 451, 26 Sup. Ct. 318, 50 L. Ed. 550; Buzard v. Houston, 119 U. S. 347, 7 Sup. Ct. 249, 30 L. Ed. 451. Upon a trial at law for fraud defendant Huntington could not successfully defend upon the ground that the voting trust and his acts thereunder relieved him, or that any plaintiff's rights were affected by the con-

version of his shares into securities of the consolidated company. The mere charges of fraud will not give equity jurisdiction; nor will averments of conspiracy and violation of trust authorize a court of equity to take jurisdiction when the gist of the action is one arising in tort for which a defendant is liable in damages where the damages can be just as readily ascertained at law as in equity. The familiar rule is well stated in Hipp v. Babin, 19 How. 271, 15 L. Ed. 633:

"Wherever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury." Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975; Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 883, 977, 37 L. Ed. 804; Walker v. Railway Co., 165 U. S. 593, 17 Sup. Ct. 421, 41 L. Ed. 837; American Publishing Co. v. Fisher, 166 U. S. 464, 17 Sup. Ct. 618, 41 L. Ed. 1079.

The latest expression of the Supreme Court is to be found in Curriden v. Middleton et al., 232 U. S. 633, 34 Sup. Ct. 458, 58 L. Ed. 765, decided March 16, 1914.

[3] Having shown that an action at law will give to any one of the plaintiffs all the relief that he is entitled to, each plaintiff may for himself begin an action; and, as the defendant Huntington does not ask the court to retain jurisdiction in order to save him from many suits, upon what principle can plaintiffs invoke equity? Not that if plaintiffs sued at law separate actions would have to be instituted, for there is in the action no class, and no representatives of a class are affected.

It is said that, inasmuch as there are 38 plaintiffs and practically the same evidence would have to be produced 38 times with the same questions of law to be determined, the remedy at law would not be as practical and efficient as this single suit. Along this line argument is made that plaintiffs should be properly joined in equity to avoid a multiplicity of suits, and authorities are cited sustaining the rule that Pomeroy lays down in his text (section 245, Pomeroy's Equity Jurisprudence) to the effect that where a number of persons have separate and individual claims and rights of action against the same party, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter may be settled in a single suit brought by all these persons uniting as plaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone, equity will take jurisdiction. But an examination of the authorities convinces us that a mere community of interest in matters of law and fact does not make it admissible to bring all plaintiffs into one suit in equity in order to avoid a multiplicity of actions.

In Tribette v. Railroad Co., 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642, the court said that it never could be established on authority "that a defendant sued for damages by a dozen different plaintiffs, who have no community of interest or tie or connection between them, except that each suffered by the same act, may bring them all before a court of chancery in one suit, and deny them

their right to prosecute their actions separately at law, as begun by them." And the court said further, if Pomeroy's test be maintained, in a hundred actions for damages arising out of the wreck of a railroad train in some of which executors or administrators, or parents and children, might sue for the death of a passenger, and in others claim might be made for divers injuries, all of such numerous plaintiffs having a community of interest in the questions of fact and law, claiming because of the same occurrence, depending on the very same evidence, and seeking the same kind of relief, could be brought before a court of equity in one suit to avoid a multiplicity of suits.

The Mississippi case was commented on in Southern Steel Co. v. Hopkins, 157 Ala. 175, 47 South. 274, 20 L. R. A. (N. S.) 848, 131 Am. St. Rep. 20, 16 Ann. Cas. 690. In the Alabama case the facts were that 110 persons lost their lives in an explosion in a mine owned by the Southern Steel Company; 110 separate suits were filed by their representatives to recover damages for alleged negligence by the owner of the mine. The corporation, alleging that it had a perfect defense applicable alike to all the suits, filed a bill to enjoin the actions at law until such defense could be determined. Thus the question of jurisdiction was raised, and the court held that, independent of special grounds for proceeding in equity, jurisdiction would be assumed to prevent a multiplicity of suits by settling in a single case a right or transaction which at law involved the trial of numerous cases, entailing loss of time and perhaps ruin in costs. The principle upon which the court sustained the right for equitable interference to avoid a multiplicity of suits was that, where numerous parties are jointly and severally claiming against one, and the same title or right of defense will be called in question and will be determinative of the issues for or against all, equity will interpose to avoid a multiplicity of suits and there need be no aid by way of independent equity. The court adverted to the case of Tribette v. Railroad Co. as being directly opposed to the views being expressed. But the Supreme Court of Alabama afterwards in the same case on a second appeal (Southern Steel Co. v. Hopkins, 174 Ala. 465, 57 South. 11, 40 L. R. A. [N. S.] 464) reversed the decision just referred to after stating the question involved in the following manner:

"Has a court of equity jurisdiction to enjoin numerous tort actions, brought by different plaintiffs against the same defendant, when there is merely a community of interest in the questions of law and of fact involved, and no common title, no community of interest or of right, in the subject-matter?"

The court discussed the text of Pomeroy and noticed that the Tribette Case has been followed by Bliss on Code Pleading, § 76, Beach on Injunctions, § 543, and High on Injunctions, § 65a, calling attention also to the fact that in the last edition of Pomeroy two new sections are added (section 251½ and section 251¾), wherein the author is regarded as modifying the views he had expressed in the original text upon which the plaintiffs in the present case rely. The court well states that the distinction between a community of interest in the subject-matter which will support the jurisdiction of chancery to prevent a multiplicity of suits and the common interest in questions of law and

of fact which will not support it is illustrated in the Tribette Case and is said to be a right enjoyed in common with all the parties and in such manner that the invasion of the right of one is an invasion of the right of all, such as a right of common fishery.

In the Turner Case, 135 Ala. 73, 33 South. 132, the court says that:

"It would seem to be an elementary and fundamental proposition that a party who seeks to come into equity must himself have an equity, * * * or he cannot maintain a bill. * * * The wholly fortuitous, accidental, and collateral fact that numerous other persons have like, but entirely independent, * * * legal rights, estates, or defenses cannot upon any conceivable principle invest him with any right, legal or equitable, and that his rights whatever they may be, are precisely the same as if no other person had similar rights."

The mere fact that a defendant has committed a tort by which he injured one or a hundred parties cannot give him an equity to prevent each and every one of the parties so injured from maintaining an action against him to recover damages. If there had been a combination or conspiracy between such numerous parties to vex and harass the complainant by numerous suits, then he would have an equity to enjoin their prosecution, but the mere fact that his tort has injured a hundred persons and that it will save him and the court time and lessen the expense of the litigation does not give him any equity to come into a court of chancery to enjoin or prevent a multiplicity of suits. We do not find anything in Hale v. Allinon, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380, in conflict with this statement of the rule.

It was said by Mr. Justice Peckham in Equitable Life Assurance Society v. Brown, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682, that it does not rest with complainant to urge as a foundation for his suit that a defendant may thereby be saved a multiplicity of suits by other parties when the defendant raises no objection to such possible suits and urges no such ground for jurisdiction in equity of the complainants' suit. Boise Artesian Water Co. v. Boise City, 213 U. S. 276, 29 Sup. Ct. 426, 53 L. Ed. 796; Vandalia Coal Co. v. Lawson, 43 Ind. App. 226, 87 N. E. 47; Cumberland Telephone Co. v. Williamson, 101 Miss. 1, 57 South. 559; Illinois Central v. Baker, 155 Ky. 512, 159 S. W. 1169. It follows that the holding of the District Court that the plaintiffs showed no ground for equitable relief must be affirmed.

[4] It being our conclusion, however, that there is a legal cause of action stated in the complaint, plaintiffs should not be turned out of court, but each should be permitted to alter the complaint by adopting such parts thereof as he may be able to utilize as a basis for his complaint at law. The essentials of the present pleading may be adopted under the suggestion just made. Such a practice does not depart from the text or spirit of equity rule 22 (198 Fed. xxiv, 115 C. C. A. xxiv). Cherokee Nation v. Kansas Ry. Co., 135 U. S. 641, 651, 10 Sup. Ct. 965, 34 L. Ed. 295; Schurmeier v. Connecticut Mutual Life Insurance Co., 171 Fed. 1, 96 C. C. A. 107; Dancel v. Goodyear Shoe Machinery Co., 144 Fed. 679, 75 C. C. A. 481; U. S. Bank v. Lyon County, 48 Fed. 632.

The order dismissing the bill is reversed, and the cause is remanded, with directions to transfer the case to the law docket and to permit the filing of an altered complaint by each of the plaintiffs.

ROGERS, Circuit Judge (dissenting). I find myself unable to concur in the opinion of the court rendered in this case.

The theory on which the suit is brought is that these 38 plaintiffs are entitled to come into equity in order to avoid a multiplicity of suits and assert their rights against respondent to recover damages for fraudulently inducing them to invest in certain stocks or stocks and bonds to their injury. It is charged in the bill, and upon demurrer must be assumed as true, that the respondent entered into a conspiracy to defraud and did defraud the plaintiffs in the manner stated in the bill. The bill is long and complicated, covering 55 printed pages. But in its ultimate analysis it asserts simply a right in each of these plaintiffs to recover damages in a single suit in equity to avoid a multiplicity of suits at law. The majority of the court think that the plaintiffs have no standing in a court of equity and that the bill cannot be maintained.

There are certain conclusions which the court has reached in which I fully agree. These are: (1) That no accounting is necessary. (2) That it is not necessary that the votes of the trustees under the voting trust should be set aside. (3) That it is unnecessary to cancel any conversion of the stock of the holding company. (4) That each of the plaintiffs has an action at law for damages upon the ground of fraud. (5) That the court of equity does not exercise its jurisdiction simply on the ground of fraud. (6) That the real object of the bill is the recovery of damages.

The mistake, which in my judgment the court has made, grows out of the following propositions, upon which, as I understand it, its opinion rests: (1) That the plaintiff Smith is an improper party to the suit. (2) That the plaintiffs compose two distinct groups or classes, and that these two groups cannot unite in one bill. (3) That there is a full, complete, and adequate remedy at law, and therefore equity cannot assume jurisdiction. (4) That a mere community of interest in matters of law and fact does not make it admissible to bring all the plaintiffs into one suit in equity in order to avoid a multiplicity of actions.

Now we come to inquire whether Herbert Francis Smith is an improper party to the suit.

The conspiracy was entered into about April, 1904, and was a continuous conspiracy. Smith bought the stock of the holding company subsequent to the conspiracy and during its continuance, buying in 1905 and "still" holding at the time the bill was filed "the same number of shares." As the bill alleges that all the plaintiffs were induced to make investments in the stock by the fraudent conduct of the respondent, which of course includes Smith, it is impossible for me to understand why he is not as proper a party to the suit as any of the others. "The real object of the suit" being, in the language of the opinion, "to recover the amounts which the plaintiffs respectively invested in their respective holdings," I fail to see why Smith's right to join with the others in seeking to recover the amount he was fraudulently induced to invest should be apparently questioned because he

"still holds" the "same number of shares" he originally purchased. The fact that he "still" holds is without significance, so far as his right is concerned, to final relief under the bill. The fact that Smith never converted any of his shares in the holding company into the stock of the consolidated cannot affect his right to join in the bill. The fraud in inducing the investment in the stock of the holding company is the gravamen of the complaint. The right to recover is not dependent upon whether there was or was not a subsequent conversion of the whole or any part of the stock of the holding company into the holdings of the consolidated. The right to maintain the suit rests, not upon the doctrine of cancellation, but upon the necessity of avoiding a multiplicity of suits. It is a matter of indifference whether Smith converted or did not convert his original holdings. As in the case of those who did convert no cancellation is necessary, the relief to be afforded to Smith and the relief of the others who did convert is exactly the same, and the injury done him is the result of the same conspiracy that injured the others, and is established by the same evidence. He is therefore a proper party to the suit.

We inquire next whether there is any justification for the classification of these plaintiffs into two groups, who have no right to unite in one bill to avoid a multiplicity of suits. The classification separates the plaintiffs who bought stock prior to the conspiracy and those who bought thereafter. This distinction might be important if those who bought the stock before the conspiracy had not purchased additional stock after the conspiracy. But each of the plaintiffs in this suit did purchase stock after the conspiracy was formed, and each was induced to do so by the fraudulent practices of the respondent in carrying out the conspiracy. That fact appears to me decisive of their right to unite in this bill. It makes the separation into two groups purely artificial and without justification in any principle of law or of equity. The only relief the equity court under this bill needs to give is damages, and there is no reason which prevents the court from awarding damages as to stock purchased after the conspiracy; the parties being remediless as to stock purchased before the conspiracy. The fact that some of the stock purchased after the conspiracy was entered into was bought in 1904 and some in 1905 and 1906 is of no significance, so far as the right to maintain the suit is concerned.

It is to be noted on the subject of parties that "it is not necessary that each of the parties should be interested in all of the questions." See Dixie Fire Insurance Co. v. American Confectionery Co., 124 Tenn., 247, 292, 136 S. W. 915, 34 L. R. A. (N. S.) 897, and the authorities there cited.

In Curran v. Campion, 85 Fed. 67, 70, 29 C. C. A. 26 (1898), a case in the Eighth Circuit, Judge Sanborn said:

"No bill is multifarious which presents a common point of litigation, the decision of which will affect the whole subject-matter, and will settle the rights of all the parties to the suit, and that it is not indispensable that all the parties should have an interest in all the matters contained in the suit but it is sufficient if each party has an interest in some material matters involved in the suit, and they are connected with the others."

In 16 Cyc. 251, in referring to the rule that a bill is objectionable as being multifarious if it unites distinct matters, it is said:

"This rule must, however, be confined to bills presenting several distinct objects, for it is not necessary that each defendant's interest should extend to all the matters of a bill with a single general object; it is sufficient if each defendant is interested in some matter involved which is connected with the others."

The cases cited support the rule. Truss v. Miller, 116 Ala. 494, 22 South. 863; Booth v. Stamper, 10 Ga. 109; Worthy v. Johnson, 8 Ga. 236, 52 Am. Dec. 399; Lenz v. Prescott, 144 Mass. 505, 11 N. E. 923; Curran v. Campion, 85 Fed. 67, 29 C. C. A. 26; Kelley v. Boettcher, 85 Fed. 55, 29 C. C. A. 14.

I pass to the consideration of the question whether equity should decline to assume jurisdiction because each plaintiff has his remedy at law for the damages to which he is entitled. The mere fact that each has his remedy at law is not sufficient to shut him out of equity unless the remedy at law is adequate. According to the Supreme Court of the United States, "it is not enough that there is a remedy at law" unless it is "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." Boyce v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655 (1830). In Cruickshank v. Bidwell, 176 U. S. 73, 81, 20 Sup. Ct. 280, 44 L. Ed. 377, Mr. Chief Justice Fuller said:

"Inadequacy of remedy at law exists where the case made demands preventive relief, as, for instance, the prevention of multiplicity of suits."

In 11 Am. & Eng. Encyc. of Law, 200, the adequacy of the legal remedy is considered, and it is said:

"The construction given to this phrase by the courts requires that the remedy at law must be as practical and efficient as the remedy afforded by chancery in order to exclude the latter from jurisdiction. * * * The fact that by proceeding in equity a multiplicity of suits might be avoided is deemed sufficient to make it more practical and efficient than the legal remedy, though in other respects the latter might offer all the advantages of the former."

And in 16 Cyc. 41, it is said:

"The existence of a remedy at law does not deprive equity of jurisdiction unless such remedy be adequate."

By this is meant that it must be clear, complete, and "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." And on page 42 of the same volume it is said:

"The greater promptness of the remedy in equity is often given as a reason for sustaining its jurisdiction. This does not mean promptness in administration, depending on the state of the calendar, nor does it mean that the progress of a suit in equity is inherently more speedy, for, on the contrary, such progress has been generally and notoriously slow. It relates rather to directness of remedy and the avoidance of circuity of action and multiplicity of suits."

I think it is plain, under the authorities, that the remedy at law, under the circumstances of the case, is not adequate. It is made inadequate by the necessity of avoiding 38 distinct and separate actions at

law, all growing out of the single conspiracy into which the respondent entered as against each of these plaintiffs.

This brings me to consider whether a mere community of interest, such as exists in this case, is sufficient to justify these plaintiffs in joining in this suit.

The leading authority in this country upon equity jurisprudence has been for many years the great work of Mr. Pomeroy's. In that work this subject has been very fully considered, and the conclusion arrived at is not in accord with that which the majority of the court announce in the case at bar.

The first edition of Pomeroy's work appeared in 1881, and in it he announced in section 257 that a community of interest in the subject-matter of the suit was sufficient to justify many plaintiffs uniting in a suit against a single defendant in order to avoid a multiplicity of suits, although each was entitled to legal redress in the common-law court. He illustrated his doctrine by the cases which hold that a number of individual proprietors of separate and distinct parcels of land, who have all been interfered with and injured in the same general manner with respect to their particular lands by a private nuisance, so that they all have a similar claim for legal redress against the author of the nuisance, may unite in a single suit. There exists in such cases no privity between the parties, no common interest or bond which bears the slightest resemblance to privity, and the parties are injured in unequal amounts, and yet there exists a sufficient community of interest in the subject-matter of the suit to enable the court to exercise its jurisdiction on behalf of the united plaintiffs. The second edition of his work appeared in 1892, and it contains the identical statement on this subject which appeared in the first edition. The third edition was published in 1905, 13 years after the Tribette Case, upon which the majority opinion lays so much stress, was decided. In that edition, which is the last which has appeared, the doctrine is stated as follows:

"Under the greatest diversity of circumstances and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of a numerous body of separate claimants against a single party or on behalf of a single party against such a numerous body, although there is no 'common title' nor 'community of right' or of 'interest in the subject-matter' among those individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. In a majority of the decided cases, this community of interest in the questions at issue and in the kind of relief sought has originated from the fact that the separate claims of all the individuals composing the body arose by means of the same unauthorized, unlawful, or illegal act or proceeding. Even this external feature of unity, however, has not always existed and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercise this jurisdiction, where the individual claims were not only legally separate, but were separate in time and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy."

In 16 Cyc. 247, the law is stated as follows:

"The fact that different matters and demands arose out of the same transaction or series of transactions may render it convenient to dispose of them together, and therefore a bill uniting them all will be proper. The particular requisites to a joinder on this ground are stated variously. A frequent statement is that different causes arising out of the same transaction may be joined when all the defendants are interested in the same claim of right and the relief sought is of the same general character. Again it is said that causes may be joined if they arise out of the same transaction or series of transactions forming one course of dealing and all tending to one end and if one connected story can be told of the whole. Where such common origin leads to a commingling of controversies, their joinder in a suit to which all concerned are parties becomes necessary. Perhaps no more definite test can be safely proposed than that of convenience in adjudicating the whole matter arising from its common origin. The most familiar application of the rule is doubtless in the case of bills embracing different injuries and demanding varied relief, all growing out of a single fraudulent scheme; such bills being sustained whether directed against one defendant or against several participating in the fraud."

The majority opinion, in declining to accept the doctrine as stated by the authorities above mentioned, refers to the fact that in Beach on Injunctions, in High on Injunctions, and in Bliss on Code Pleading a different principle is announced.

In Beach on Injunctions (Ed. of 1895) § 543, the matter is disposed of in a brief paragraph in which the principle adopted in the majority opinion is announced and supported by the citation of the case of Tribette v. Illinois Central R. Co., decided three years before in the Supreme Court of Mississippi. The only other case the author cites is a Massachusetts one (Cadigan v. Brown, 120 Mass. 493, 495). An examination of that case shows that there is not a word in it which supports or lends countenance in the remotest degree to the doctrine which the majority opinion adopts. On the contrary, the case was one in which the several plaintiffs holding their rights under distinct titles and to separate lots abutting on a passage way were allowed because of their community of interest to maintain their bill in equity to restrain a private nuisance. The court said:

"The plaintiffs, though they hold their rights under separate titles, have a common interest in the subject of the bill. They are affected in the same way by the acts of the defendants, and seek the same remedy against them. There is no danger of confusion in the trial or of injustice to the defendants from the joinder of the plaintiffs; but the rights of all parties can be adjusted in one decree, and a multiplicity of suits is prevented. We are therefore of opinion that this ground of demurrer cannot be sustained."

High on Injunctions, § 65a, states that:

"It is to be observed that, in order to justify relief by injunction for the prevention of a multiplicity of suits, there must be some common subject-matter of controversy or some common right or interest therein, and that without this a mere community of interest in the questions of law and fact to be determined constitutes no basis for equitable relief."

Mr. High, like Mr. Beach, does not review the authorities or examine into the subject at length. The only cases which he cites are Tribette v. I. C. R. Co., 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am.

St. Rep. 660; Ducktown Sulphur, C. & I. Co. v. Fain, 109 Tenn. 56, 70 S. W. 813; and Turner v. City of Mobile, 135 Ala. 73, 33 South., 132.

Bliss on Code Pleading, § 76, to which reference has been made, contains no discussion or allusion to the jurisdiction of the courts of equity or to the right of parties to unite in one suit in equity in order to avoid a multiplicity of suits. He is discussing the right of parties to unite in a suit under the Code, and he states that all who would unite must be interested in the subject of the action and in the relief He goes on to define what is meant by the phrase "subject of the action," which is used in the different parts of the Code, and states that in general it is the matter or thing concerning which the action is brought. And he illustrates his meaning by saying that, if two or more owners of mills propelled by water are injured by an obstruction above that interferes with the downflow of the water, they cannot unite in an action for damages under the Code, as they are without a common interest.

The case of Tribette v. Illinois Central R. Co., 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642 (1892), seems to be the chief authority in support of the principle upon which the majority opinion is based. In that case a number of different owners of property destroyed by fire from sparks emitted by an engine of the company sued separately to recover damages for their respective losses occasioned by the fire, alleged to have resulted from the defendant's negligence. Thereupon a bill in equity was filed by the railroad company to enjoin the prosecution of the suits upon the ground that they all grew out of the same occurrence and depended for their solution upon the same questions of law and fact, and to prevent a multiplicity of suits and the vexation and harassment consequent thereon. The bill was dismissed; the court writing an elaborate opinion in which authorities were examined and the conclusion reached that a mere community of interest "in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of a numerous body," is not sufficient to justify the interposition of chancery to settle in one suit the several controversies. The court admitted that its conclusion was contrary to the doctrine set forth in Pomeroy's work, but it declared with a good deal of emphasis that it was satisfied that that distinguished writer was wrong and was not supported by the authorities which he cited. In taking this position the court was compelled to overrule an earlier case which it had decided, that of Pollock v. Okolona Savings Institution, 61 Miss. 296, decided in 1883. But it is important to observe that the Tribette Case not only failed, as we have seen, to cause Pomeroy to withdraw his alleged erroneous doctrine but that it has itself been absolutely repudiated and overthrown by the court which decided it, and that not once but a number of times. In 1902 in Illinois Central Railroad Co. v. Garrison, 81 Miss. 257, 32 South. 996, 95 Am St. Rep. 409 the court began by "distinguishing" the case, and in 1903, in Crawford v. Railroad Co., 83 Miss. 708, 36 South. 82, 102 Am. St. Rep. 476, it was flatly over-

ruled, and the doctrine of the earlier Pollock Case was reasserted. The Chief Justice writing the opinion said:

"We think the doctrine announced by Pomeroy is sound and clearly established by the best-considered modern cases."

In 1904 the question came again before the same court in Tisdale v. Insurance Cos., 84 Miss. 709, 36 South. 568, and the doctrine of Pomeroy was accepted. In 1907 the matter was again before the court in Whitlock v. Yazoo, etc., R. Co., 91 Miss. 779, 784, 45 South. 861, with a like result. Once more in 1909 it came up again in Ship Island Railroad Co. v. Barnes, 94 Miss. 484, 48 South. 823, also with a like result; the court saying:

"This court has in many cases recently most carefully re-examined this whole subject, and has re-established the doctrine announced in Pollock v. Okolona Savings & Trust Co., and overruled the case of Tribette v. I. C. Railroad Co."

The Mississippi court in Cumberland Telephone & Telegraph Co. v. Williamson, 101 Miss. 1, 57 South. 559 (1910), again reversed itself, overruling the cases which overruled the Tribette Case and re-establishing the doctrine of the latter case. Each time the personnel of the court changes the position of the court on this question seems to change with it.

The Tribette Case, soon after it was decided, was followed by the Supreme Court of Alabama in Turner v. City of Mobile, 135 Ala. 73, 33 South. 132 (1902), a case also relied upon in the majority opinion in the case at bar. But in the subsequent case of Southern Steel Co. v. Hopkins, 157 Ala. 175, 190, 47 South. 274, 20 L. R. A. (N. S.) 848, 131 Am. St. Rep. 20, 16 Ann. Cas. 690 (1908), the Tribette Case is repudiated in the Alabama court in like manner as we have seen it was in the Mississippi court. The Alabama court said:

"The case, however, of Tribette v. Railroad Co., 70 Miss. 182, 12 South. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642, is directly opposed to our views. That case we consider as overruled by the subsequent one in the same court of Hightower & Crawford v. Railroad Co., 83 Miss. 708, 36 South. 83, 102 Am. St. Rep. 476, in which the court expressly approves the view repudiated in the Tribette Case. It is said in the Hightower Cases, 'We think the doctrine announced by Pomeroy is sound and clearly established by the best-considered modern cases.' After this repudiation of the Tribette Case, by the Supreme Court of Mississippi, we will not follow the reasoning of the opinion in that case to point out its deflection from, and opposition, in our opinion, to, the ancient as well as modern view of the extent of the jurisdiction of courts of equity in reference to multiplicity of suits. That jurisdiction is too well established and too beneficent, when wisely exercised, to be any longer called in question. It would be a strange casus in juridical evolution to meet the needs of society if there was no remedy against a party being vexatiously prosecuted at the same time by over 7,000 separate invalid claims held by insolvent plaintiffs, as in the Sheffield Waterworks Case, L. R. 2 Chan. 8, when each case is founded on the same facts, and when it is alleged and admitted, by the objection to the jurisdiction, that there is a defense common to all the claims. It is to avoid the monstrosity of such a result that the court of chancery extends its plenary jurisdiction to stay the proceedings at law until the question of liability can be determined in one suit, and therefore we hold that the bill in the case was well filed."

In a recent case the Supreme Court of Alabama again reversed itself, overruled Southern Steel Co. v. Hopkins, and announced its adhesion to the doctrine of Turner v. Mobile. "We therefore conclude," the court says, "to adhere to the former doctrine," although "it is not to be doubted that there are many high authorities to the contrary." And the court goes on to concede that "the text announced by Mr. Pomeroy," in what it calls his "inestimable work," "has been followed in a great number of adjudicated cases, and probably in the majority of the cases in which the exact proposition involved has been passed upon." Roanoke Guano Co. v. Saunders, 173 Ala. 347, 56 South. 198, 35 L. R. A. (N. S.) 491 (1911). But the opinion in the Roanoke Case is to my mind neither convincing nor persuasive. The vacillation of the court on this subject impairs to some extent the weight which might otherwise be accorded to its judgment.

In 1902 the Supreme Court of Tennessee followed the Tribette Case in Ducktown Sulphur, Copper & Iron Co. v. Fain, 109 Tenn. 56, 70 S. W. 813. In the latter case a copper company had been sued by numerous persons for a tort committed by killing trees and vegetation with copper smoke. It was held that mere community of interest in the questions of law and fact was not a ground for the interposition of chancery to settle in one suit the several controversies. But in 1910 the same court had the subject again under consideration with a result suggestive of that which we have seen was reached in Mississippi and in Alabama. In Dixie Fire Insurance Co. v. American Confectionery Co., 124 Tenn. 247, 136 S. W. 915, 34 L. R. A. (N. S.) 897, a bill in equity was held not demurrable but good in order to avoid a multiplicity of suits upon the following facts: Five insurance companies separately issued policies on a manufacturing plant; one company insured only the machinery, another insured the machinery and stock, another one issued a policy on the machinery and a separate policy on the stock, another issued a policy upon the building, machinery, and office fixtures. The policies were different as to their dates, their amounts, the property insured, and the name of the insurer, but were otherwise identical. The questions of defense were common to all the parties. The defenses were: Misrepresentations in procuring the policies; the keeping of explosives by the insured, in violation of the policies; and certain other alleged violations of the conditions of the policies which need not be mentioned. The court sustained the right of equity to assume jurisdiction in order to prevent a multiplicity of suits. According to the language of the court its right to assume jurisdiction was "not based on the postulate that the court of law is without jurisdiction, but simply on the ground that a multiplicity of suits would be thereby prevented, and that in such prevention both the public and private interest would be subserved."

The length of this opinion precludes examination of these several cases in detail. It is remarkable that we should find such a series of decisions of affirmations and reversals as these cases present. There seems to be a great confusion of thought upon the subject and a failure to accurately distinguish the cases to which Pomeroy's rule is applicable from the cases to which it is not applicable. There are

cases of negligence to which Pomeroy's rule has no application. See Pomeroy, Equity Jurisprudence (3d Ed.) § 251½. But there are certain cases of negligence to which the rule is clearly applicable. As has been pointed out in 25 Harvard Law Review, p. 559 (1912):

"If the complainant presents to the equity court an issue of contributory negligence or of damages, with each defendant, so that no simplification would result from a single trial Pomeroy's rule does not apply, but where a single issue is presented by the complainant's alleging absence of negligence on his part, jurisdiction should be taken. But courts failing to appreciate this distinction have neglected Pomeroy's rule altogether. It is to be regretted that the Alabama court, in overruling a former decision based on Pomeroy's rule, nevertheless repudiates the rule."

I have referred to the negligence cases, not because Pomeroy's rule is confined to that class of cases, for clearly it is not. But to point out that the rule is not applicable to all negligence cases and that the failure to recognize that fact has led to a confusion of ideas and to the rejection of the rule itself by some courts which have failed to recognize its proper limitations.

The Supreme Court of the United States has never denied that a community of interest in the questions of law and fact involved will suffice to support a bill filed to avoid a multiplicity of suits. Indeed, in Hale v. Allinson, 188 U. S. 65, 78, 23 Sup. Ct. 244, 252, 47 L. Ed. 380 (1903), the court, speaking through Mr. Justice Peckham, said:

"We are not disposed to deny that jurisdiction on the ground of preventing a multiplicity of suits may be exercised in many cases in behalf of a single complainant against a number of defendants, although there is no common title nor community of right or interest in the subject-matter among such defendants, but where there is a community of interest among them in the questions of law and fact involved in the general controversy."

And in Bitterman v. Louisville & Nashville Railroad Co., 207 U. S. 205, 226, 52 L. Ed. 171, 12 Ann. Cas. 693 (1907), in sustaining a bill claimed to be multifarious because of misjoinder of parties and causes of action, the same court said:

"The acts complained of as to each defendant were of like character, their operation and effect upon the rights of the complainant were identical, the relief sought against each defendant was the same, and the defenses which might be interposed were common to each defendant and involved like legal questions."

In 1890, in a case in the Circuit Court of the United States, Mr. Justice Harlan, in Osborne v. Wisconsin Central R. Co., 43 Fed. 824, declared that a community of interest in the questions of law and fact was sufficient to give jurisdiction to a court of equity in order to avoid a multiplicity of suits. And see Illinois Central R. Co. v. Caffrey (C. C.) 128 Fed. 770 (1904), where it is said that "a common interest in the questions to be litigated" is sufficient ground for coming into equity to avoid a multiplicity of suits.

I rest my dissent in this case, without going further into the authorities upon the doctrine announced in Pomeroy and which has not been successfully challenged, and in my opinion cannot be, that a community of interest in the questions of law and fact involved is sufficient to support a bill filed to avoid a multiplicity of suits. The cases which

support this view are sound in principle and accord with the weight of authority.

But there remain other phases of the subject to which brief reference should be made.

In Equitable Life Assurance Society v. Brown, 213 U. S. 25, 51, 29 Sup. Ct. 404, 53 L. Ed. 682, Mr. Justice Peckham said:

"Complainant also claims jurisdiction in equity on the ground that such an action will prevent a multiplicity of suits. But this is not a case for the application of the doctrine. * * * It does not rest with complainant to urge as a foundation for his suit that the defendant may thereby be saved a multiplicity of suits by other parties when the defendant raises no objection to such possible suits and urges no such ground for jurisdiction in equity of the complainant's suit."

The reference to this decision in the majority opinion in the case at bar seems to indicate that it is understood as laying down the proposition that the right to come into equity to avoid a multiplicity of suits is simply a privilege which equity accords to a party against whom a multiplicity of suits may be brought. I do not so understand the Supreme Court; neither do I understand that any such principle is established in equity jurisprudence. In the case in the Supreme Court there was a single plaintiff suing a single defendant to assert a claim for which he had an adequate remedy in a common-law court, which he could assert in a single action. It may be conceded that there is no precedent in the books which would allow a single plaintiff to file a bill in equity to avoid a multiplicity of suits under such circumstances. The law is clearly well established that under such circumstances the bill cannot be filed. In the case in the Supreme Court the defendant was not asking the court to protect him against a multiplicity of suits, and the plaintiff was not asking to be himself protected against a multiplicity of suits, as he could in a single action at law dispose of the whole controversy. Nevertheless he was undertaking to invoke the doctrine in behalf of numerous parties who had not joined in the suit and therefore were not in court claiming the privilege for themselves. If they had joined him in the suit, and if the matter could not have been disposed of in a single action at law, then it would have been an entirely different matter. In the case at bar it does not follow that, because the defendant Huntington is not asking to be protected from separate suits being instituted against him by these plaintiffs, they have no right to unite in one action their legal demands against him. On the contrary, the rights of the plaintiffs are wholly independent of the defendant Huntington's wishes. In 16 Cyc. 64, the rule is stated:

"The jurisdiction is exercised, however, either to protect the right of one asserted against many, or the rights of many against one. In spite of some authority to that effect that it is only the person who would otherwise be subjected to a multiplicity of suits who can maintain the bill, the rule is that either party may invoke the jurisdiction."

And in Pomeroy, § 269, of the Third Edition, it is also said:

"That the overwhelming weight of authority effectually disposes of the rule laid down by some judges as a test, that equity will never exercise its jurisdiction to prevent a multiplicity of suits, unless the plaintiff or each of the plaintiffs is himself the person who would necessarily, and contrary to his own will, be exposed to numerous actions or vexatious litigation. * * *

This position is opposed to the whole course of decision, * * * from the earliest period down to the present time."

The case of Curriden v. Middleton, decided in the Supreme Court of the United States on March 16, 1914, is not in conflict with the conclusion at which I have arrived. That was a bill in equity filed against three defendants to compel them to make restitution to the complainant by paying him the amounts of money which he had paid out in reliance upon the fraudulent representations of Middleton, who was alleged to have entered into a conspiracy with the other two to defraud him. The complainant did not come into equity to avoid a multiplicity of suits. His claim was one which could be disposed of in a single action at law, and he could at his option join all the alleged conspirators as defendants in the one action at law. There was no possible basis for the maintenance of the suit upon such a state of facts and the Supreme Court dismissed the bill. The plaintiffs in the case at bar come into equity to avoid a multiplicity of suits. They cannot unite in a single action at law, but would have to bring 38 separate actions. The two cases are absolutely unlike. In the Curriden Case there was no multiplicity of suits to be avoided.

Courts of equity, of course, have no jurisdiction to give damages when damages constitute the sole ground for the bill. Bispham's Equity (8th Ed.) p. 52. But the equity court has jurisdiction to give damages where the recovery of damages is not the sole purpose of the bill, the suit being founded upon some equitable principle such as the avoidance of a multiplicity of suits. Story's Equity Jurisprudence, § 796.

It may be said that for equity to assume jurisdiction is to deprive the defendant of his common-law right to a trial by jury. The answer, however, is that he has no such right except in cases where the remedy at law is adequate. For reasons stated, the remedy at law in this case is not adequate, and therefore his right to a jury trial does not exist. Oelrichs v. Spain, 15 Wall. 211, 228, 21 L. Ed. 43 (1872).

The prevention of a multiplicity of suits was said by Chancellor Kent in Brinkerhoff v. Brown, 6 Johns. Ch. (N. Y.) 151 (1822), to be "a very favorite object" with a court of chancery. Moreover, the wrongs complained of in the case at bar originated in fraud, and such wrongs from the earliest times down to the present have appealed with peculiar force to the conscience of chancellors. This court should overrule the demurrer to the bill and retain jurisdiction of the suit, if it can do so according to the established rules of equity jurisprudence. I find nothing in the rules of equity which requires this court to dismiss the bill. It has been filed to avoid a multiplicity of suits There is a community of interest in the questions of law and fact which are involved which justifies the court in retaining jurisdiction of the suit. All the plaintiffs have been defrauded by the acts of the respondent in inducing them to buy the stock of a certain corporation. The fraudulent conspiracy has affected each of them in the same way and can be shown by the same evidence. The relief to be afforded to each is the same.

I therefore think the action of the court below in dismissing the bill should be reversed.