J. C. HOPPER V. J. M. NATION, *as Auditor of the State of Kansas.*

No. 15,899. (96 Pac. 77.)

SYLLABUS BY THE COURT.

1. SCHOOL-LANDS—*Appraisement*—"*Legal Subdivisions.*" In the provision of the statute (Gen. Stat. 1901, § 6339) requiring each "legal subdivision" of school-land to be appraised separately prior to its being exposed to sale, the phrase quoted refers to the smallest subdivision under the congressional system of surveying, namely (except where for special reasons lots are platted in more or less irregular shape, as in the case of fractional sections), quarter quarter-sections, or forty-acre tracts.

2. ———— *Prairie Land—Subdivisions.* The provision of the law relating to the sale of school-land (Gen. Stat. 1901, § 6346) that "timber land may be subdivided into lots of such size as the superintendent of public instruction and appraisers may deem best" implies that prairie land is not subject to indefinite subdivision, and the context fixes the limit at forty-acre tracts.

3. ———— *Tracts Less than Forty Acres—Evidence of Proper Subdivision.* One who claims to have purchased school-land in tracts of less than forty acres must show, in order to enforce a right as such purchaser, that it was so subdivided by the county superintendent of public instruction and the appraisers.

4. ———— *Same.* The decision of the probate judge that one who has petitioned as a settler is entitled to purchase school-land is conclusive only upon those matters as to which the court is required to find—that is, as to the facts stated in the petition; and, as the petition is not required to show a subdivision of the land by the statutory tribunal having jurisdiction thereof, such decision of the court, when made with respect to tracts of less than forty acres, does not determine that such subdivision has been duly authorized.

5. ———— *Settlement on Leased Lands—Right to Purchase.* A preference right to the purchase of school-land can not be acquired by settling thereon while a lease is in force.

6. ———— *Termination of Lease.* The lessee of school-land can not terminate his lease and thereby throw the land open to settlement by any act of his own, without the concurrence of the board of county commissioners.

7. —— *Void Sale—Acceptance of Purchase-price—Right to a Patent.* The acceptance by the county treasurer of the purchase-price of school-land under color of a void sale does not impose the obligation upon the state to issue a patent therefor.

8. —— *Retention of Purchase-price Does Not Estop State to Resist Demand for a Patent.* Where a claimant of school-land under a void sale seeks a writ of mandamus to compel a public officer to take some step as a preliminary to the issuance of a patent, and the state intervenes to support the officer in his refusal to do so, it is not necessary to a denial of such relief that the state shall restore to the plaintiff the amount he has paid to the county treasurer as the purchase-price.

Original proceeding in mandamus. · Opinion filed May 9, 1908. Writ denied.

*Lee Monroe,* and *George A. Kline,* for plaintiff.

*Fred S. Jackson,* attorney-general, and *John S. Dawson,* assistant attorney-general, for defendant.

The opinion of the court was delivered by

MASON, J.: On July 21, 1906, a petition was presented to the county superintendent of public instruction of Ness county for the sale of a tract of school-land, described as follows: The northeast quarter of the southeast quarter, the north half of the south half of the southeast quarter, the north half of the south half of the southwest quarter, and the northwest quarter of the southwest quarter of section 36, in township 18, range 26 west of the sixth principal meridian. Appraisers were appointed, and the land was appraised at $3.50 an acre. Within sixty days John H. Hornung filed in the probate court a petition as a settler, asking that he be allowed to purchase the land, and setting out the usual averments. On October 1, 1906, the probate court heard the petition and found that its allegations were true, and that Hornung was entitled to take the land at its appraised value. He

thereupon paid one-tenth of the purchase-price to the county treasurer and received a certificate of purchase from the county clerk, which he afterward assigned to J. C. Hopper. On October 8, 1907, Hopper paid the remainder of the purchase-price and received a certificate from the county clerk showing such payment. Thereafter he asked the auditor of state to indorse upon this certificate a statement that the county treasurer had been charged with the amount therein named, this being a necessary preliminary to the procuring of a patent from the governor. (Gen. Stat. 1901, § 6355.) The auditor refused to make the indorsement, and Hopper applied to this court for a writ of mandamus to compel him to do so. The attorney-general intervenes in behalf of the state and supports the auditor in his refusal. The case is submitted upon agreed facts.

The first ground upon which the auditor challenges the right of the plaintiff to a patent—for that is what the controversy amounts to—is that the entire proceedings relative to the sale of the land are void because the law only authorizes school-land to be sold in regular forty-acre tracts, while the premises here involved are laid out in irregular shape, involving the cutting in two of four of such tracts, as shown by the description already given. The statute (Gen. Stat. 1901, § 6339) provides that as a preliminary to the sale of school-land each "legal subdivision" thereof shall be separately appraised. The phrase quoted has a definite meaning, which attached to it long before the passage of the act cited. It applies only to the divisions of land which result from the application of the ordinary methods used in the making of a government survey, the smallest of these being the forty-acre square, or quarter quarter-section, except where by reason of special conditions lots of more or less irregular shape are laid out, as in the case of fractional sections. Thus, in *Robinson v. Forrest,* 29 Cal. 317,

in interpreting the federal statute (2 U. S. Comp. Stat. 1901, § 2481) granting swamp lands to certain states, the grant covering all "legal subdivisions" the greater part of which was unfit for cultivation, the court said:

"The third section amounts in some respects to a limitation upon the general terms of the first section, and constitutes a more accurate designation of the lands granted. The legal subdivisions mentioned are the subdivisions made under the authority of congress alone. The smallest subdivisons, under the congressional system, are quarter quarter-sections, or forty-acre lots, unless a fractional quarter-section is subdivided, when the subdivisions may be smaller than forty-acre lots, and different in their general form. It is to these smallest subdivisions that reference is made in section 3, and if the greater part of any such subdivision is wet and unfit for cultivation it vests in the state. This is the obvious meaning of the term 'legal subdivisions,' as employed in that section, and this construction is given to it by the department of the interior, as appears by the rules and instructions issued soon after the passage of the act, as well as at a late date." (Page 323.)

(See, also, *Brown's Lessee v. Clements et al.*, 44 U. S. 650, 668, 11 L. Ed. 767; *William K. Lente v. Brent L. Clarke, Adm'x*, 22 Fla. 515, 525, 1 South. 149; *Fredericks v. Zumwalt*, 134 Cal. 44, 66 Pac. 38; 26 A. & E. Encycl. of L. 346; 1 Lester Land Laws, Regulations and Divisions, 544.)

The school-land law does not in terms forbid the further division of a "government forty," but it does specifically provide that "timber land may be subdivided into lots of such size as the superintendent of public instruction and appraisers may deem best." (Gen. Stat. 1901, § 6346.) This provision distinctly implies that as a rule school-land is not capable of indefinite subdivision; that as to prairie land there is a fixed limit, which must be sought in the context. Such limit can be found only in the use of the term "legal subdi-

vision," and in its interpretation as the smallest sub-division under the congressional system of surveying.

But it is suggested in behalf of the plaintiff that, even conceding that prairie land can not be sold in twenty-acre tracts, the decision of the probate court was an adjudication that Hornung was entitled to pur-chase the land and implied a finding of all facts essen-tial thereto, including a determination that the tract in question was timber land and that it had been sub-divided into twenty-acre lots by the action of the county superintendent and the appraisers. The statute, how-ever, clearly defines the scope of the probate court's inquiry and the effect of its decision, in these words:

"Said court shall require the petitioner to prove the facts set forth in his petition." (Gen. Stat. 1901, § 6345.)

"In all cases where the court shall find that the peti-tioner has settled upon and improved school-lands, as set forth in his petition, the petitioner may purchase the said lands, not exceeding one quarter-section, for the appraised value thereof, exclusive of the value of the improvements." (Gen. Stat. 1901, § 6346.)

The allegations of the petition are required to be:

"That he has settled upon said land and has resided thereon continuously for a period of not less than six months immediately prior to said appraisement; that he has permanently improved said land to the amount of one hundred dollars; that said improvements con-sist of a permanent dwelling, and such other improve-ments as show an intention to make a permanent home thereon; that said land has been appraised, and the amount thereof; that said improvements have been appraised, and the amount thereof; that he has not heretofore taken school-land to the amount of one quarter-section under the provisions of this act, or of the act of which this is amendatory; that he has given ten days' public notice through a newspaper of general circulation in the county where said land is situated, setting forth in such notice a description of the land, the names and residences of two witnesses by whom he expects to prove said settlement and improvements;

the time when (the time to be fixed by the probate judge) said petition will be heard by the probate court, and asking that he be allowed to purchase said land." (Gen. Stat. 1901, § 6341.)

The right of the petitioner to purchase the land follows from the court's finding of fact that his petition is true. The only allegation of the petition that might be deemed to relate in any way to the character of the land is that in reference to its appraisement. There is some plausibility in the contention that a finding that the land had been appraised implied that it had been legally appraised, and therefore that it had been lawfully subdivided into the tracts to which the appraisement was applied. The subdivision and the appraisement, however, are separate and distinct actions, performed by different bodies. The appraisement is made by three appraisers, appointed by the superintendent, with the consent of the county commissioners. The subdivision is made by the superintendent and the appraisers. The petition is required to allege the appraisement, but not the subdivision. The statute creates an independent tribunal, composed of the superintendent and the appraisers, which alone can under certain circumstances give authority for the sale of school-land in lots of less than forty acres. It is incumbent upon one asserting a right dependent upon such a grant to allege and prove it. There being no showing here of that character, the plaintiff has failed to establish a legal purchase of the land, and for that reason is not entitled to compel the auditor to aid him in procuring a patent. If it were shown that the superintendent and appraisers had given the tract the form in which the plaintiff claims it, doubtless no question could now be raised whether it was in fact timber land. That is a matter intrusted to the decision of the special tribunal, and its conclusion, in the absence of fraud, must be regarded as final and not subject to review, in the probate court or elsewhere.

Another consideration is fatal to the plaintiff's claim. In January, 1904, a school-land lease to the firm of Smith & Peckham, expiring January 1, 1909, was duly executed, which included the tract already described. On December 30, 1905, the lessees, for a valuable consideration, surrendered possession of this tract to Hornung, who thereupon made the settlement under which the plaintiff claims. On January 1, 1906, they paid the rent in full on all the land up to the time of the expiration of the lease, and filed with the county clerk a statement by one of the members of the firm that he relinquished his claims to the tract here involved. The clerk then wrote upon his record of school-land leases the description of this tract, and these words: "Lease paid in full Jan. 1, 1906, $12.50, and settled on."

When school-land is leased it may still be sold subject to the lease, for the statute distinctly so provides, but it is necessarily withdrawn from settlement. Inasmuch as the lessee has the exclusive right of possession, obviously no one over his objection can lawfully establish a residence thereon. And certainly the legislature never intended that a school-land lease should give its possessor the power to sell to whomsoever he may see fit what is in effect a preëmption—a right to purchase the land at its appraised value in preference to all others. This power he has if he can terminate the lease at any time by his own act. Since the tenant's rights may be forfeited for non-payment of rent upon due notice, it may well be that a lease can be annulled by agreement between the county board and the lessee. In such case the commissioners could give equal opportunity to prospective settlers by insisting upon the date of expiration being fixed in the future. In the present case there is no suggestion of an agreement by the county commissioners to a termination of the lease. The entry made upon the record by the county clerk, even if he had the power to bind the state, does not purport to be an acceptance of the lessee's relinquish-

ment. The lessee may at his own pleasure waive or abandon his own rights, but he can not alone set aside the contract; he can not alone convert leased land into unleased land—land that is not open to settlement into land that is open for settlement.

The plaintiff's counsel contend that prior decisions of this court establish a contrary doctrine, and cite *Schwab v. Wilson*, 72 Kan. 617, 84 Pac. 123, as being squarely in point. The opinion in that case shows what was there considered and determined, namely, (1) that the pendency in this court of an application for mandamus to compel an appraisement preliminary to a sale of school-land did not deprive the district court of jurisdiction to enjoin its sale under other proceedings, and (2) that one who has settled upon school-land in order to purchase it has such an interest with respect thereto that he may enjoin its unlawful sale. The facts as disclosed by the record bore some resemblance to those here presented, but were sufficiently dissimilar so that a distinction might readily be made. We prefer, however, not to undertake a detailed statement of the resemblances and differences, for the reason that in *Schwab v. Wilson* the question here involved was not argued, considered or decided, and therefore that case should not be regarded as an authority upon it. The case of *Davies v. Benedict*, 75 Kan. 47, 88 Pac. 536, is also relied upon by the plaintiff. But all that was there decided was that one who enters upon school-land while a lease is in force does not by that act incur a disability to claim rights as a settler in virtue of his being upon the premises after the lease has expired.

It is argued that the acceptance of the purchase-price by the county treasurer imposes the obligation upon the state to issue a patent, upon the principle that the transaction is one of a business character, in which the conduct of the state must be subject to the same rules as that of an individual, and that it can not retain both the land and the money. Among other cases

on this proposition counsel especially rely upon *Ambrose v. Huntington*, 34 Ore. 484, 56 Pac. 513 (cited in 26 A. & E. Encycl. of L., 364), wherein the court said:

"It may be observed, in passing, that the county school superintendent was not the agent of the state, with power to execute a deed to its school-lands; but, as he had contracted to convey the same, and the state had received, accepted and retained the purchase-price, it thereby became bound to the observance of his contracts regarding the land, as it operated as a ratification of his acts in the premises (Mechem, Agency, §§ 148, 149), so that there was substantially a contract on the part of the state with plaintiff to convey to him the premises in dispute." (Page 488.)

The opinion does not indicate through what agency or by the act of what officer the state was deemed to have accepted the purchase-money and thereby to have ratified the sale. A county treasurer who accepts the payment of money from one who buys school-land at an unlawful sale acts without authority. His action in accepting and retaining the money is not that of the state, and does not estop the state to repudiate the sale.

In *State, ex rel., v. Dennis*, 39 Kan. 509, 18 Pac. 723, it was held that where the state seeks the aid of a court to set aside a sale of school-land on the ground of illegality it must tender back the purchase-money, but the decision was distinctly based upon the consideration that the state voluntarily came into court asking affirmative relief. Here the state is not the moving party; it is resisting the demand for a patent by one who is not entitled to it. Although his money has been accepted by a county officer assuming to act in behalf of the state, the state is not precluded from questioning his right by the fact that no machinery has as yet been provided by which a return of the purchase-price may be had.

The writ is denied.