Skinner v. Mitchell.

---

No. 23,538.

FRANK N. SKINNER, suing for himself and 874 others, *Appellee,* v. CHARLES A. MITCHELL, as County Treasurer of Montgomery County, et al., *Appellants.*

No. 23,543.

THE STATE OF KANSAS, ex rel. Alfred G. Armstrong, as County Attorney of Montgomery County, *Plaintiff,* v. W. F. TROUTMAN, as Sheriff of Montgomery County, *Defendant.*

SYLLABUS BY THE COURT.

1. MANDAMUS—*Writ May Not Issue to One Not a Party to the Action.* An action in mandamus was brought by taxpayers to compel the county treasurer to issue and the county clerk to countersign receipts for certain taxes. The alternative writ was allowed and the court, upon learning that the sheriff held tax warrants against some of the plain-

Skinner v. Mitchell.

tiffs, issued an order restraining him from serving or collecting the warrants. The sheriff not being a party to the action, it is held that the court was without power to make an order enjoining him from performing the duties of his office.

2. SAME—*Numerous Taxpayers—Community of Interest—Suit by One for Benefit of All Similarly Aggrieved.* The provisions of the civil code (§ 37, Gen. Stat. 1915, § 6927), that when the action is one of common or general interest to many persons, or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue for the benefit of all, are held to apply to a situation where a single taxpayer, in an action to compel the issuance of a tax receipt, sues for himself and on behalf of 874 other taxpayers similarly aggrieved, claiming that all had paid their taxes to a bank, which was a county depository, and that the money had been accepted and received by the treasurer in payment of such taxes— for the reason that (notwithstanding the individual claims were not only legally separate, but separate in time and each arose from an entirely distinct transaction) there was a community of interest among all the claimants in the question at issue and in the remedy.

3. SAME—*To Compel Issuance of Tax Receipts—Pleading—Certain Allegations Mere Conclusions of Pleader.* On December 17, 1920, the plaintiffs paid to a realty company at Coffeyville, as their agent, the amount of their individual taxes, together with a small commission, to the agent. On December 20, the realty company deposited in the Peoples State Bank at Coffeyville, which had been designated as a county depository, the money paid by the plaintiffs, and the bank delivered to the realty company deposit slips crediting the county treasurer with the money. On December 21, the realty company sent to the county treasurer the bunch of deposit slips and memoranda showing the amount paid to the bank by each taxpayer. On January 17, following, the county treasurer, without issuing any tax receipts to the plaintiffs, made a sight draft on the bank at Coffeyville for the full amount of the deposits. Payment was refused and the bank closed its doors. On a motion to quash the alternative writ directing the issuance of tax receipts to the plaintiffs, it is held that statements in the pleading to the effect that actual cash was paid and delivered to the county treasurer when the money was placed in the bank to his credit, and that such deposit was accepted by him and thereby was recognized, treated, taken over and charged as a public fund by the county treasurer as well as by the board of county commissioners and county clerk, are mere conclusions of the pleader and not statements of fact, and further held, that the motion to quash should have been sustained.

Case No. 23,538. Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed April 26, 1921. Reversed.

*Alfred G. Armstrong,* county attorney, *Donald W. Stewart,* assistant county attorney, *Chester Stevens,* and *J. B. Tomlinson,* both of Independence, for the appellants.

*Walter S. Keith, Harold McGugin,* and *Charles Bucher,* all of Coffeyville, for the appellee.

Case No. 23,543. Original proceeding in mandamus. Opinion filed April 26, 1921. Writ allowed.

*Alfred G. Armstrong,* county attorney, and *Chester Stevens,* of Independence, for the plaintiff.

No appearance was made for the defendant.

The opinion of the court was delivered by

PORTER, J.: These actions are in mandamus. One comes to the court by appeal from an order of the district court of Montgomery county overruling a motion to quash the alternative writ, and an appeal in the same cause by the sheriff from an order against him. The other is an original proceeding by the state, on the relation of the county attorney, to compel the sheriff of Montgomery county to proceed with the collection of certain tax warrants placed in his hands by the county treasurer.

When the appeal in the first case was lodged in this court, the county treasurer and county clerk were granted an order staying proceedings against them, and an order by which the district court enjoined W. F. Troutman, sheriff of Montgomery county, from serving and collecting certain tax warrants, and from which the sheriff appealed, was suspended until the further order of this court.

The litigation began with the filing of a suit in the district court by Frank N. Skinner, for himself and on behalf of 874 other taxpayers similarly situated and aggrieved, in which the defendants were Charles A. Mitchell, county treasurer, and Elmer Joyce, county clerk of Montgomery county. The alternative writ alleged that plaintiffs, who are resident property owners and taxpayers in the city of Coffeyville, Montgomery county, have been refused the proper credit and official receipt of the county treasurer for taxes paid by them for the year 1920, that the Peoples State Bank of Coffeyville was one of the

county depositories duly designated by the board of county commissioners, and received from time to time, allowing interest thereon, public moneys, and gave to the county credit therefor, which credit Charles A. Mitchell accepted and appropriated as county treasurer; that it became his duty to charge the depository bank with all public moneys deposited therein by the county treasurer "or otherwise received by and coming into its possession, for and to the credit of such county treasurer," and that on or about January 17, 1921, the defendant Joyce, as county clerk, credited the defendant Mitchell, as county treasurer, with all the moneys then and at that time in such depository bank to the credit of the county treasurer, which included the moneys theretofore deposited by the plaintiffs to the use and credit of the county treasurer.

The manner in which Frank N. Skinner paid his taxes (which it is asserted is the same way in which the other plaintiffs paid theirs) is described in substance as follows: The Weaver Realty Company of Coffeyville is a copartnership. On December 17, 1920, Frank N. Skinner paid to the realty company, as his agent, $65.07, which was the amount of the first half of his taxes. He also paid the realty company twenty-eight cents as a commission for its services. In evidence of the payment the Weaver Realty Company delivered to plaintiff its receipt as follows:

"OFFICE OF THE WEAVER REALTY COMPANY.

F. E. Garverick.     Ben L. Jones.                    #1294

COFFEYVILLE, KANSAS, 12–17–1920.

Received of Frank N. Skinner.............................. $65.35
In full of 1st ½ Taxes for 1920, on the following described property in Montgomery County:

| L 23 B 1 Osborn's Fourth Add. | 58.65 |
| Per Coffeyville, Kan. | 6.42 |
| | 65.07 |
| | .28 |
| | 65.35 |

F. H. WEAVER REALTY COMPANY.
By F. E. GARVERICK."

On December 20, 1920, the realty company deposited in the Peoples State Bank of Coffeyville the sum of $65.07 to the credit of the defendant, Charles A. Mitchell, as county treasurer, and in evidence of such deposit the bank delivered to the

realty company its credit slip, crediting the county treasurer with such deposit. The petition contains the following: "and which credit slip was in turn promptly delivered by said realty company to said county treasurer, and by said county treasurer accepted, and the deposit thereby represented was regularly charged to said bank, was recognized, treated, and taken over and appropriated as a public fund by said county treasurer, as well as by the board of county commissioners and county clerk of said county—all with the approval, knowledge, and consent of said bank." The plaintiffs allege that the money paid by them through this agency became public money, and having been credited to the county treasurer it became his duty to issue a treasurer's receipt therefor, countersigned by the county clerk, and that on demand the defendants refused to issue such receipts. It is alleged that the defendant, as county treasurer, threatened and was about to place tax warrants in the hands of the sheriff for execution.

The district court overruled the motion to quash the writ. At the same time the court sent for the sheriff, and upon his admitting that among the tax warrants turned over to him by the county treasurer were several which were against some of the 874 persons referred to as plaintiffs, the court issued an order enjoining him from levying the warrants or enforcing collection.

1. The sheriff's appeal presents the question whether the trial court had authority to issue the order against him. The sheriff was not a party to the action against the treasurer and the court possessed no power to make any order enjoining him from performing the duties of his office. The moment the tax warrants came into his hands, the statutory duty rested upon the sheriff to collect them. Failure to perform would render him liable upon his official bond. Not being a party to the action between the plaintiffs and the county treasurer, he was in no respect concerned with the questions there involved. These, in short, are the reasons why the order was suspended which enjoined the sheriff from performing his official duties.

2. One of the grounds for the motion to quash the alternative writ issued against the county treasurer is that there is a misjoinder of parties. It is contended that the plaintiff Skinner has no right to maintain an action on behalf of other tax-

payers involving in each instance a separate transaction and for a different payment of money. It can hardly be said that there is no community of interest in the plaintiffs.

The code provides that when the action is one of common or general interest to many persons or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue for the benefit of all. (Civ. Code, § 37; Gen. Stat. 1915, § 6927.)

Mr. Pomeroy, referring to the general theory of the jurisdiction which prevailed at an early period, says:

"This early theory has, however, long been abandoned. The jurisdiction, based upon the prevention of a multiplicity of suits, has long been extended to other cases of the third and fourth classes, which are not technically 'bills of peace,' but 'are analogous to' or 'within the principle of' 'such bills. Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of a numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right' or of 'interest in the subject matter,' among these individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. In a majority of the decided cases, this community of interest in the questions at issue and in the kind of relief sought has originated from the fact that the separate claims of all the individuals composing the body arose by means of the same unauthorized, unlawful, or illegal act or proceeding. Even this external feature of unity, however, has not always existed, and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy." (1 Pomeroy's Equity Jurisprudence, 4th ed., § 269.)

This text has been quoted with approval in a multitude of cases. (*Lockwood Co. v. Lawrence,* 77 Me. 297, 309; *Goldfield Consol. Mines Co. v. Richardson,* 194 Fed. 198; *Watson v. Huntington,* 215 Fed. 472; *Cloyes et al. v. Middlebury Electric Co. et al.,* 80 Vt. 109.)

Skinner v. Mitchell.

In answer to the objection often urged that because each claim is entirely distinct from those of all the others, and a decision as to one or more could not in any manner dispose of the rights or demands of the others, Mr. Pomeroy says:

"The sole and sufficient answer to the objection is found in the actual facts. The jurisdiction *has* been exercised in a great variety of cases where the individual claimants were completely separate and distinct, and the only community of interest among them was in the question at issue and perhaps in the kind of relief, and the single decree *has* without any difficulty settled the entire controversy and determined the separate rights and obligations of each individual claimant." (§ 269.)

In the present case the community of interest lies in the legal questions involved, the similarity of the situation of the several taxpayers, and in the fact that the character of relief sought would be applicable to all. The case is one falling within the code provision, and there was no misjoinder.

3. At the oral presentation a number of facts were conceded which, although not stated in the alternative writ, it is deemed necessary to mention in order to explain how the controversy arises. The last of the payments by the several plaintiffs was made on December 20 when the books of the county treasurer closed. On December 21, the realty company sent to the county treasurer a package or bunch of deposit slips issued by the bank for the payments made by the 875 taxpayers. The total amount was in excess of $52,000. Doubtless because of the usual congestion of business after December 20 in the county treasurer's office this bunch of deposit slips and memoranda was not reached by the treasurer until January 17. On that date, and without issuing any tax receipts to the plaintiffs, the treasurer made a sight draft on the Peoples State Bank of Coffeyville for the full amount of the deposits. When the draft reached the bank, payment was refused; the bank was insolvent and immediately closed its doors.

Aside from the amount of money involved and the large number of persons affected, the case presents a question of much public importance. It is well known that in a few other counties of the state, similar plans have been put in practice by which taxpayers residing in towns or cities distant from the county seat have been permitted to pay their taxes through a bank or other agency and avoid the inconvenience and the usual delays incident to the payment of taxes directly to the

county treasurer. The only time such practice or custom has been called to the attention of the court was in the case of *Holt v. Hall*, ante, p. 63, 193 Pac. 1058, and that case did not involve the validity of such payments. The defendants, who were agents of certain taxpayers, had obtained from the county treasurer more tax receipts than they had paid for and he sued to recover payment. In the opinion it was said:

"Plaintiff carried the amount as a cash item on his personal responsibility for some time, expecting payment. . . . [He] then, as he was bound to do unless he chose to treat the receipts as inadvertently issued and to recall them for cancellation, made good the amount to the county treasury out of his own pocket, and brought this action, in his private capacity." (p. 63.)

It was held that the evidence was sufficient to sustain a judgment in his favor (which was the only question presented), but it was said in the opinion:

"That the custom of issuing receipts 'in bunches' to trusted persons who sent, or who were later to send, their checks therefor, instead of requiring spot cash, United States currency, was not authorized by law is no defense to this action." (p. 64.)

The averment in the pleading that actual cash was paid and delivered to the county treasurer when the money was placed in the bank to the credit of the county treasurer, and that such deposit was accepted by the treasurer, must be regarded as a mere conclusion and not as a statement of fact. The statement that the deposit thereby represented was regularly charged to the bank; was recognized, treated, taken over and charged as a public fund by the county treasurer as well as by the board of county commissioners and county clerk, is also nothing more than a conclusion of the pleader.

The statement that the bank at Coffeyville had been designated as one of the depositories of the county's funds adds nothing to the plaintiffs' right to maintain the action. It seems to be conceded that the order designating it one of the depositories limited the amount which the treasurer was authorized to deposit there to a sum less than one-half of the amount deposited by the realty company for plaintiffs' taxes. However that may be, no person had any right to deposit money in that bank to the credit of the treasurer except the treasurer himself. It could be a lawful depository without deposits. It

could not become an actual depository until money belonging to the county was placed there in deposit by the treasurer.

The treasurer is a mere ministerial officer. The statute provides that it shall be his duty to receive all moneys belonging to the county, from whatever source they may be derived, and such other moneys which are directed by law to be paid to him. (Gen. Stat. 1915, § 2764.) He is required to keep a just and true account of receipts and expenditures of all money which shall come into his hands by virtue of his office, in books to be kept by him for that purpose, which shall be open at all times for the inspection of the board of county commissioners or any member thereof and all county and state officers. (Id. § 2765.)

Section 2776 provides:

"That where any draft or check remitted to any county treasurer shall not be paid on presentation, any tax receipt issued to any such person shall be forthwith canceled by the county treasurer on his books noting on his records that such receipt is canceled for nonpayment of the check or draft sent in payment thereof."

Section 2788 provides for county depositories but expressly declares that the county treasurer shall deposit daily all moneys of whatsoever kind that shall come into his possession by virtue of his office as such county treasurer, in his name as such treasurer in one or more responsible banks located in the county and designated by the board of county commissioners as county depositories.

When making up his deposits for the bank the county treasurer is required to make duplicate tickets for such deposits and file the same with the county clerk. (Gen. Stat. 1915, § 2789.) And it becomes the duty of the county clerk to charge the bank designated as the depository with all public money deposited by the treasurer. (Id. § 2790.)

There is a provision that all tax receipts shall be countersigned by the clerk before the same are delivered to the person entitled to the same, and the clerk shall charge the amount thereof to the treasurer. (Id. § 2794.) The violation of this provision of the act by either the treasurer or the clerk is declared to be a misdemeanor punishable by a fine not exceeding $500 and removal from office. (Id. § 2795.)

Section 11394 provides that when the treasurer receives any taxes he must give a receipt therefor. The taxes are payable

in money except where there is some express provision for the payment in interest coupons on bonds, or bonds and warrants in specific cases. (*Id.* § 11395.)

The plaintiffs say in their brief:

"We do not claim that the deposit slips were some sort of bill or ne-gotiable instrument, or that the giving of the slips to the treasurer was the act of payment. We claim that the slips were only evidence of payment; that the real act of payment was the placing of the money in the bank to his credit, and there subject to his check and order, and to no other person's order or demand; that the acceptance and retention of the slips by the treasurer for at least 30 days, and some of them for as long as 53 days, and until the bank was closed, together with the fact that he and the county clerk were treating and crediting the deposit as a public fund, is a final and complete acceptance of the payment."

The principles of law upon which this claim is predicated are sound and have received the fullest sanction of courts when applied to controversies arising between individuals, but in controversies arising between individuals and the public these principles have no room for application. All money from the payment of taxes is public money and belongs to the county. The powers and duties of the county treasurer and county clerk in respect to public money and the payment of taxes are defined by statutes, and the county will not be estopped by a misinterpretation of the statutes by either officer. The county cannot be estopped by any unauthorized act of the treasurer or clerk in respect to public money. (*Hopper v. Nation*, 78 Kan. 198, 205, 206, 96 Pac. 77.) See, also, *In re Moseley's Estate*, 100 Kan. 495, 164 Pac. 1073, holding that the approval by the probate court of the final account of an executor before the inheritance tax against the estate was paid, was not binding on the state. The opinion quotes with approval the following from *The people v. Brown et al.*, 67 Ill. 435:

"'It is a familiar doctrine, that the State is not embraced within the Statute of Limitations, unless specially named, and by analogy, would not fall within the doctrine of estoppel. Its rights, revenues, and property would be at fearful hazard, should this doctrine be applicable to a State. A great and overshadowing public policy of preserving these rights, revenues and property from injury and loss by the negligence of public officers, forbids the application of the doctrine. If it can be applied in this case, where a comparatively small amount is involved, it must be applied where millions are involved, thus threatening the very existence of the government.

"'The doctrine is well settled that no laches can be imputed to the government, and by the same reasoning which excuses it from laches, and on the same grounds, it should not be affected by the negligence or even willfulness of any one of its officials.' (p. 438.)" (p. 498.)

Authorities cited by the plaintiffs to the effect that where the holder of a check or other genuine instrument representing a fixed sum delivers it to a bank and receives an unqualified credit as for a definite sum of money, the transaction is equivalent to an actual deposit of so much cash as of the date of the credit (*National Bank v. Burkhardt*, 100 U. S. 686), and authorities that where, under these circumstances, a bank fails the next day, the plaintiffs, having received credit by drawing for the deposit, could not demand the identical checks as their property, rest upon principles of law upon which the plaintiffs in the present case cannot rely because the defendants are public officials.

The difference between the principles of law which apply to transactions between individuals and the county treasurer in this case is recognized in the case of *Barnard v. Mercer*, 54 Kan. 630, 39 Pac. 182. The defendant, who was the county treasurer, received a draft in payment of taxes sent for that purpose. The decision was rendered prior to the enactment of the statute requiring the treasurer to note on his books the cancellation of a tax receipt on account of nonpayment of a check or draft received in payment thereof. Nevertheless, the court held that taxes can only be paid in money unless the law specifically authorizes the treasurer to receive something else (*Judd v. Driver*, 1 Kan. 455), and that a check or draft given to a collector for the payment of taxes does not discharge the tax, unless the check or draft be in fact paid. (*Houghton v. Boston*, 159 Mass. 138; Black on Tax Titles, § 50.)

In the opinion it was said:

"Under the authorities, the actual acceptance by the treasurer of a draft in payment of the taxes would not bind the public, if the draft afterwards proved to be worthless. The reason is that the treasurer is absolutely without power to discharge the rights of the public to the payment of the tax for anything else than money, or such warrants or public securities as the law specifically authorizes him to receive.

"The main difficulty in this case probably arises from the fact that the treasurer held the draft so long that, if the transaction had been between individuals, the loss occasioned by the failure of the Lincoln bank would have fallen on him; but neither the taxpayer alone, nor with the aid of

the treasurer, can impose on the public the risks incident to private commercial paper." (p. 632.)

In the opinion in that case there are expressions indicating that it would be sufficient to bind the public if the money actually finds its way into a county depository to the credit of the defendant as county treasurer. That question, however, was not involved in the case and the remarks were made merely by way of illustration, and, for reasons already suggested, are not a correct statement of the law.

In 27 A. & E. Encycl. of L., it is said:

"The payment or tender of taxes must be absolute and unconditional. The taxpayer and the collector can make no arrangement whereby the taxpayer is discharged from liability for his taxes by anything except the absolute payment of them. In some states, however, the collector is permitted to satisfy the tax by payment to the treasurer and to enforce his claim for the payment so made against the person taxable.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"The receipt of a check, draft, or note, the marking of the taxes paid on the books, and the delivering of a receipt will not constitute payment nor conclude the public in a controversy between the taxpayer and the authorities. The check or draft given to a collector as payment does not discharge the lien unless such instrument be in fact paid." (pp. 750, 751.)

In 26 R. C. L. 376, it is said:

"A check is not payment of a tax, until the check is paid, even if received by the collector as payment, and if the collector neglects to present the check for payment for several days and in the meantime the bank on which it was drawn becomes insolvent, the tax may still be collected from the taxpayer." (Citing *Koones v. District of Columbia,* 4 Mackey [D. C.] 339, 54 Am. Rep. 278.)

The public is not bound by anything the treasurer does toward the acceptance of a check on a bank for the amount of the drawer's taxes which is, at most, only a conditional payment. (37 Cyc. 1164.)

Whatever might be the rule as between individuals, no estoppel can be urged against the county, and as the tax money belongs to the county, no acts or representations of the treasurer would estop the county until the money actually came into his possession and control. The realty company was the agent of the plaintiff taxpayers. The bank in which the deposits were made was also an agent of the plaintiffs until the money actually came into the possession and control of the treasurer.

An interesting case in point, although upon facts quite dissimilar, is *State v. Mutual Life Ins. Co.*, 175 Ind. 59. Under a statute authorizing persons, claiming to have money demands against the state arising out of a contract express or implied, to bring suit against the State of Indiana in the superior court of Marion county, the insurance company brought suit to recover taxes paid under protest for the years 1904 and 1905. The complaint alleged that for more than 25 years the company had paid its annual tax for permission to do business as a foreign corporation; that the statute provided that the auditor of state should issue the permit but that the tax should be paid to the state treasurer. It alleged that for 25 years preceding 1904 each auditor of state construed the statute as authorizing him to receive and collect the tax when he issued the permit; that during all that time each auditor had annually demanded and received payment of the tax from all foreign insurance companies seeking permits, and that in 1904 and 1905 all foreign insurance companies so applying, except 5 out of 162, paid the tax to the auditor; and that during all those years the auditors had in every instance paid the money to the treasurer, and also had published annual reports showing their action in this respect, and that each governor and legislature of the state and the public were informed of the facts. It was alleged that in 1904 and 1905 the plaintiff paid its tax to one Sherrick, state auditor, who, instead of paying it into the state treasury, converted it to his own use; that he had been prosecuted and convicted of embezzlement; that on appeal to the supreme court the conviction was set aside on the ground that he had no lawful authority to receive such tax; that after the decision of the supreme court the plaintiff, under protest, paid a second time the taxes for 1904 and 1905.

The demurrer of the state to the complaint was overruled and the state appealed. In reversing the judgment for the reason that the complaint failed to state a cause of action the supreme court disposed of the question of estoppel as against the state by the unauthorized acts of ministerial officers, and in the discussion characterized certain statements in the complaint as mere conclusions of the pleader and not as statements of fact to be admitted by the demurrer.

Skinner v. Mitchell.

Answering the argument that if the auditors accorded a wrong construction to the law, and the state acquiesced therein, it was precluded, the court in the opinion said:

"The infirmity of this argument is that it would be unreasonable to assert that the state can be held in any manner to have acquiesced in the unauthorized acts of said auditors. Those officers having no jurisdiction to interpret the provisions of the statute in controversy, their act in so doing was unwarranted, and *the charge that the state accepted the construction and acquiesced therein is but a conclusion of the pleader.*" [Italics ours.] (p. 81.)

Because of the undisputed proposition that, in a case where a person seeking the benefit of the estoppel has knowledge or means of knowledge in respect to all the facts, equal to that possessed by the one against whom the estoppel is urged, there can be no valid estoppel, the court said:

"It [the appellee] and the state were bound to know that the auditor of state was not authorized by the statute to receive the money for the taxes. Hence, in respect to the question of knowledge or notice, the state and appellee may be said to have been on a parity with each other." (p. 83.)

The court is powerless to relieve the hardships that must result to this great number of taxpayers who believed when they parted with their money that their taxes were paid. But equitable considerations cannot prevail against statutory requirements and the rights of the public to the collection of public funds in accordance with statutory rules is paramount to the rights of individuals.

Wholly aside from any facts developed at the oral presentation of these cases, to which some reference has been made in the course of the opinion, it must be held that upon the bare statements of the pleading itself no cause of action is stated in the alternative writ.

Because of the reasons given for suspending the order of the court in the same action restraining the sheriff from performing his duties, it follows that in the action brought by the county attorney the peremptory writ will issue directing the sheriff to proceed with the collection of the tax warrants.

In the action brought by the taxpayers the judgment is reversed, and the cause remanded with directions to quash the writ.