[No. 22175. Department One. December 30, 1930.]

AUGUST GREENBLUM *et al., Respondents,* v. CLYDE D. GREGORY *et al., Appellants.*[1]

*John I. O'Phelan,* for appellants.
*Blackburn & Gielens,* for respondents.

MILLARD, J.—Claiming title thereto, through the United States and by adverse possession thereof, the prescribed statutory period, plaintiffs commenced this action September 29, 1927, to quiet title to land east of the east meander line of Tinker's lake in lots three, four and nine, of section sixteen, township ten, range eleven, in Pacific county. Defendants alleged that they deraigned title to the same land from the United States

[1]Reported in 294 Pac. 971.

through the state of Washington and various mesne conveyances; and also claimed title to the land by virtue of adverse possession the required period of time.

The cause was tried to the court. No findings of fact or conclusions of law were made. The trial court was of the opinion that the pleas of adverse possession should not be sustained in favor of the plaintiffs or the defendants; and that, by virtue of the deed of 1861 from the county commissioners to plaintiffs' predecessors in interest, the plaintiffs' title was superior to defendants' title, which originated in 1907. Decree was accordingly entered in favor of the plaintiffs. From that decree the defendants have appealed.

The conclusion we have reached obviates the necessity of considering the question of adverse possession.

The land in controversy is in fractional school section sixteen, township ten north, range eleven west of the Willamette meridian, in Pacific county, which was surveyed in 1858, and the map thereof, made in conformity with the field notes, was duly examined and approved by the United States surveyor general of Washington territory and filed in his office October 19, 1859. The section was surveyed in lots, and not subdivided into the usual quarter sections. A lake (Tinker's or Crawfish), meandered by the surveyor general extends north and south through the section. The government survey describes the lands east of the lake as lots three, four, and nine; and the lands west of the lake as lots two, five, and eight. If section sixteen had been subdivided into quarter sections, the western portion (the land in dispute) of lots three, four and nine would be located in the northwest and the southwest quarters of section sixteen, and would be east of the east meander line of Tinker's lake.

As an aid to an understanding of the issue, there is submitted the following, more or less inaccurate, but sufficient, drawing of the section:

The dispute is as to those portions of lots three, four and nine which lie west of a center north and south line indicated by A-B on the above drawing. The respondents claim this property by reason of and through purchases made of the northwest quarter and ·the southwest quarter of said section from the·county commissioners of Pacific county in 1861. The board of county commissioners was authorized by act of the territorial legislature passed January 24, 1861, to sell school lands at public sale on thirty days' notice. Sec-

tion 3 of the Laws of 1861, p. 32, provided that the land be sold in legal subdivisions of not more than one hundred and sixty acres in a lot.

"The land shall be sold ' . . . in legal subdivisions of not more than 160 acres in a lot . . ."

Pursuant to the foregoing authority, the board of county commissioners of Pacific county sold to Thomas Warman, December 25, 1861, the northwest and southwest quarters of section sixteen, township eleven (later corrected to township ten). The deed recited that the two tracts contained a total of two hundred and fifty-eight acres. The deed described the land as follows:

"The N.W. one quarter of section No. 16 in township No. 11 N. of range No. 11 W. containing 129½ acres, also the S.W. one quarter of section No. 16, in township No. 11 W. Willamette meridian, containing 128½ acres. Making in all 258 acres at $1.25 per acre . . ."

Warman conveyed the northwest and southwest quarters of section sixteen, township eleven, to one Reed. On August 9, 1876, the county commissioners executed a deed conveying to Reed the northwest and southwest quarters of section sixteen, township ten. That deed recites that the two tracts contain a total of two hundred and fifty-eight acres, and that the deed was issued to correctly describe the land as in township ten, and not in township eleven, as recited in the 1861 deed to Warman. The respondents claim their title through H. H. Tinker, who acquired title through Reed and others. Tinker conveyed the two tracts of land to the respondents Greenblum in August, 1908.

As stated above, section sixteen was not subdivided into quarter sections. No government post was established, and no monument was found that might indicate any intention to subdivide the section into quarter

sections. The section was subdivided into lots as shown by the field notes. The deeds to Warman and Reed expressly limit the grant to two hundred and fifty-eight acres, the approximate amount (a later survey disclosed that the two tracts contain a total of two hundred and fifty-six acres) of land west of the west meander line of the lake. The grantees paid for two hundred and fifty-eight acres at one dollar and twenty-five cents an acre, the total consideration paid amounting to $322.50. No taxes were ever paid by respondents or their predecessors on the land in dispute. They paid taxes only on lots two, five and eight, which were west of the lake. In 1909 one of the respondents tried to pay taxes on the land east of the lake, but the county treasurer refused to receive payment, he stating that the taxes were paid by parties on the east side of the lake who owned the land. There is no evidence in the record that respondents ever subsequently endeavored to pay taxes on the disputed land.

The appellants and their predecessors, in purchasing lots three, four and nine from the state (their title originated in 1907), paid for a definite quantity of land, and have paid all taxes thereon. Their deeds recite the acreage of each lot, and the recited amount of land is the acreage in lots three, four and nine, as shown by the government plat and field notes.

The county commissioners' description as the northwest and the southwest quarters of the section must yield to the survey and the plat and the designation of the subdivisions as lots and not as quarter sections. The commissioners were authorized by the act of 1861 to sell the land "in legal subdivisions" of not less than a stated acreage.

The phrase "legal subdivisions," as applied to appraisement and sale of school lands, has a definite meaning.

"The statute (Gen. Stat. 1901, § 6339) provides that as a preliminary to the sale of school-land each 'legal subdivision' thereof shall be separately appraised. The phrase quoted has a definite meaning, which attached to it long before the passage of the act cited. It applies only to the divisions of land which result from the application of the ordinary methods used in the making of government surveys, the smallest of these being the forty-acre square, or quarter quarter-section, *except where by reason of special conditions lots of more or less irregular shape are laid out, as in the case of fractional sections.*" *Hooper v. Nation,* 78 Kan. 198, 96 Pac. 77.

The description in the deed of the land as certain quarter sections of a section of a township was a reference to the plat of the survey, and the plat and field notes were thereby incorporated into the deed, and furnish the true description of the boundaries of the land conveyed. As said in *Little v. Williams,* 88 Ark. 37, 113 S. W. 340:

"Courts take cognizance, judicially of the general system of government surveys, and, accordingly, we know that lands are surveyed and platted into sections and parts of sections and into fractionals where they abut on streams or other bodies of water. The record in this case contains a plat and the field notes of the governmental surveys of the land surrounding Walker's lake, and they confirm the facts of which we are already judicially cognizant. . . . Description of lands, according to terminology employed in the system of governmental surveys and plats of lands, is necessarily a reference to the plats of those surveys; . . . Therefore, giving the word 'township' used in the stipulation of facts the meaning which we must attribute to the parties who employed the term, it has reference to the townships surveyed and platted by the government surveyors, and means the townships according to the surveys and plats."

The regularity, sufficiency and correctness of the government survey and map have not been questioned.

The land was sold by the commissioners by reference mistakenly to subdivisions as quarter sections, whereas the government subdivisions of the section were lots. The survey map of this particular fractional section does not contain a legal subdivision designated as the northwest quarter or as the southwest quarter. No authority has been cited, nor are we able to find any, which permits the county officials to re-survey, re-plat or change the legal subdivisions as established; and while this is not the open contention of respondents, the effect of sustaining their position would.be to recognize the establishment of new subdivisions different from the official plat.

The government was the grantor. To enable it to convey the land, a government survey was made, and the subdivisions within the section were designated as lots. The government did not intend to disregard its own survey and convey something not determined by that survey. The government made its survey and designated it as composed of lots, and when the transfer was made and the amount of acreage stated, title passed to only that portion of the land.

Respondents and their predecessors purchased a limited area of land. They understood, or should have understood, that they were purchasing only the land west of the west meander line of the lake. That they recognized title to the land east of the east meander line was in persons other than themselves, clearly appears from their inaction when they were advised in 1909 by the county treasurer that taxes would not be accepted from respondents on the land in dispute; that it was owned by other parties who were paying the taxes thereon.

The conveyance of the northwest quarter and the southwest quarter of section sixteen included only those legal subdivisions which, according to the official

survey map, are entirely within such description; and as lots three, four and nine are partially outside of such geographical designation, they are in no way affected in whole or in part by the conveyances. In the survey of public lands,

". . . boundary lines actually run, and marked on the surveys returned, shall be established as the proper boundary lines of the sections or subdivisions for which they were intended; . . ." *Railroad Co. v. Schurmeir,* 7 Wall. (U. S.) 272, 286.

By the government survey, the east boundary line of lots two, five and eight was made the west meander line of the lake; and the west boundary line of lots three, four, and nine was made the east meander line of the lake. The deeds to respondents and their predecessors in interest cannot be construed as conveying any interest in lots three, four and nine; therefore the judgment of the lower court is reversed with directions to dismiss the respondents' action.

MITCHELL, C. J., TOLMAN, BEALS, and PARKER, JJ., concur.